1

2                    UNITED STATES DISTRICT COURT

3                          DISTRICT OF NEVADA

4

5   INTERNET SPORTS INTERNATIONAL,            Case No. 2:23-cv-893-ART-NJK
    LTD.,
6                                             ORDER ON PLAINTIFF'S MOTION
                   Plaintiff,                 FOR PARTIAL SUMMARY
7                                             JUDGMENT, DEFENDANT'S MOTION
           v.                                 FOR SUMMARY JUDGMENT, AND
                                              MOTIONS TO SEAL
8   AMELCO USA, LLC. et al.,                  (ECF Nos. 262–66, 283).

                   Defendants.
9

10         Plaintiff ISI sued Defendants Amelco UK ("AUK") and Amelco USA ("AUSA,"

11   together, the "Amelco parties") for allegedly stealing ISI's confidential information

12   and trade secrets to make rival sports-betting kiosks. ISI seeks summary

13   judgment on elements of its three breach-of-contract claims, while Amelco seeks

14   summary judgment on ISI's entire case. (ECF Nos. 263, 266.) Also pending before

15   the Court are both parties' motions to seal and ISI's motion to file a sur-reply.

16   (ECF Nos. 262, 264, 283.)

17   **I.    Factual Background**

18         In 2018, the Supreme Court overturned the federal law that prohibited

19   sports gambling in most states. *See Murphy v. NCAA*, 584 U.S. 453 (2018). This

20   led to a proliferation of sports-gambling businesses in both online and "retail"

21   markets. While most sports-betting takes place online, retail sports betting—

22   including using kiosks at casinos and other brick-and-mortar locations—remains

23   an important part of the industry. (ECF No. 272-3 at 106.) Some state laws

24   require sports-gambling companies to maintain a retail presence to operate in

25   the state, even if a company primarily operates online. (*See Id.* at 108–09.)

26         ISI is an American sports-gambling company that specializes in kiosks for

27   retail. It assembles software and hardware into kiosks, maintains such kiosks,

28   and manages bets and distributions through its kiosks. (*Id.* at 103.)

Amelco ("AUK") is a British company that makes software for online sports betting and financial trading. (ECF No. 266 at 11.) Amelco USA ("AUSA") is a Delaware Limited Liability Corporation owned in equal shares by AUK's founder Damian Walton and American gambling professional Rob Miller. (*Id.* at 12.)

After the *Murphy* decision, both Amelco and ISI sought market share in the several states where sports gambling had become legal. (*Id.* at 13; ECF No. 271 at 11.) ISI approached Amelco about a partnership in which ISI would assemble kiosks for retail sports-gambling using Amelco's software. (ECF No. 271 at 11.)

### A.    ISI and AUSA Contract with One Another.

ISI, through its president, William "Bill" Stearns, approached AUSA's manager Rob Miller to discuss collaborating. In March 2019, Bill Stearns and Rob Miller entered a Non-Disclosure Agreement ("NDA") concerning a "Possible Transaction." (ECF No. 262-1 at 2.) The NDA requires that the parties use any confidential information exchanged only for the purposes contemplated by the "Possible Transactions." (*Id.* at 3.) The expiration term of the NDA states that it will "expire and terminate two years from the date either Party notifies the other in writing that discussions concerning the Possible Transaction are terminated." (*Id.* at 4.)

Six weeks after entering the NDA, Bill Stearns and Rob Miller entered a License Agreement on behalf of ISI and AUSA, respectively. The contract requires ISI to pay royalties to AUSA for a license to use Amelco's software on ISI's kiosks. (ECF No. 262-2 at 5.) It also allows ISI to request payment for time spent on technical design services to "Americanize" Amelco's horse-racing software. (*Id.* at 6.) This contract required ISI to maintain Amelco's information as confidential, but it did not require any confidentiality obligation from Amelco. (*See id.* at 3.) The License Agreement includes an integration clause stating that it constitutes the parties' "entire understanding and agreement." (*Id.* at 8.) AUSA's manager Rob Miller and AUK's co-owner Damian Walton testified in their depositions that

they believed the NDA had been incorporated into the license agreement. (ECF No. 265-1 at 61, 77.)

Around three months after entering the License Agreement, ISI President Bill Stearns wrote to representatives at AUSA and JCM—a third-party company that develops printers for gambling kiosks—that "ISI has an NDA signed with Amelco and JCM" and that since the three companies would be collaborating, another NDA "should be signed so everyone feels comfortable and all companies can talk to each other directly." (ECF No. 272-4 at 46.) AUSA's President Rob Bone replied to the email that "all development efforts are going to be handled by the Amelco UK group" and invited Amelco UK employees Paul Manning and James Wood to collaborate. (*Id.* at 44.)

Two months after this email exchange, ISI, AUK, AUSA, and JCM entered a Mutual Confidentiality Agreement ("MCA") that required the parties to "safeguard . . . and strictly maintain the confidentiality of all Confidential Information received" and to "use all Confidential Information received . . . solely for purposes of evaluating the Potential Transaction with the other Party." (ECF No. 262-3 at 4.) The MCA defines "Disclosing Party" as "the Party disclosing its Confidential Information under this Agreement" and "Receiving Party" as "the Party receiving the Disclosing Party's Confidential Information." (*Id.* at 3.) The MCA also required JCM to "use its best efforts to mark such Confidential Information . . . to indicate its confidentiality." (*Id.*) Rob Bone signed the MCA as the representative of AUSA, and he held himself out as President of AUSA in emails with Rob Miller, one of AUSA's principals. (*See* ECF No. 279-3 at 2; ECF No. 262-3 at 8.)

Months later, when resigning as president of AUSA, Rob Bone sent an email to AUK and AUSA staff explaining that Damian Walton, AUK's co-owner and AUK's signatory on the MCA, would continue as one of two main principals at AUSA. (ECF No. 263-10 at 2.) AUK's CEO would "continue to assist with all US

business initiatives;" AUK's project manager would "continue to lead all development and product management efforts;" and AUK's Project Specialist would "continue to facilitate all customer support and [project-management tool] JIRA deliverables." (*Id.*) AUSA maintains a low cash flow and lists Robert Miller's other company's headquarters as its official headquarters, while AUK employees in the UK may run AUSA's day-to-day business. (*See* ECF No. 262-6.)

### B.    Amelco and ISI Fail to Consummate a Kiosk Agreement.

Months after ISI and Amelco began collaborating, ISI's President Bill Stearns sought a contract in which the Amelco parties would pay ISI for kiosks and kiosk maintenance over a twenty-year period. Over the next two years, the parties negotiated, but never executed, this deal.

In July 2019, ISI billed Amelco for seven kiosks for a fee of $1,000 per kiosk, along with a $100 fee per kiosk for software support. (ECF No. 272-5 at 26.)

A month later, ISI sent AUSA a kiosk agreement, which had a twenty-year term and required Amelco to pay a $1,000 fee to ISI for any retail kiosk Amelco obtained, regardless if it was through ISI, along with $100 per month for maintenance and servicing of such kiosks. (*See* ECF No. 266 at 21–22.) AUSA did not accept this draft. (*Id.* at 24–25.) AUSA proposed a counteroffer with a five-year term, without the requirement to pay ISI for kiosks not obtained through ISI, and with a provision that allowed AUSA to terminate the contract at will. (*Id.*) Several weeks later, AUSA told ISI that it needed to negotiate the agreement with AUK instead of AUSA. (ECF No. 266-2 at 109.) AUK then declined to accept ISI's previous version of the contract. (*See* ECF No. 265-1 at 199.)

Weeks later, AUK gave ISI another draft agreement with several proposed changes: it changed the required signatures from each respective party, reduced the term of the agreement from twenty to five years, removed the condition that AUK pay ISI for kiosks not obtained through ISI, and eliminated a termination

fee. (*See* ECF No. 266-2 at 120–25.) ISI did not agree to these terms. (*See* ECF No. 265-1 at 200–01.)

Almost a year later, in September 2020, ISI contacted AUK to "finalize the kiosk and kiosk support contract." (ECF No. 266-2 at 50.) In October, AUSA (based out of a London address) paid an invoice for five more kiosks, again paying ISI the fee of $1,000 per kiosk and $100 per month for kiosk support. (ECF No. 271 at 70; ECF No. 272-5 at 31.) In November, ISI provided AUK and AUSA with a new draft contract, which did not incorporate AUK's edits, and both ISI and AUK's representatives rejected each other's respective drafts. (ECF No. 266-3 at 114, 116.) Brandon Walker, head of business development for Amelco, stated in his deposition that while he knew ISI wanted to finalize the agreement, he also knew, by October 2020, that from Amelco's perspective "it was never gonna fly." (ECF No. 272-3 at 68.)

Negotiations continued into July 2021, with ISI's Stearns writing to AUK's representative that the companies would limit bonuses on the Licensing Agreement "contingent upon us coming to agreement on the kiosk contract which unfortunately is still a very open topic." (ECF No. 266-3 at 127.) Stearns testified in his deposition that AUK's Chief Operating Officer Leon Wynne then "killed the deal" by ending negotiations. (ECF No. 266-1 at 4–5.)

### C. ISI Provides Amelco Intellectual Property Related to Kiosks.

Over the course of their relationship, ISI provided Amelco with assistance, including sports-gambling kiosks, instances of ISI's software running on kiosks, troubleshooting of their collaborative kiosks in the Wildwood casino in Colorado, and code for connecting kiosks with other third-party technology.

AUK bought two kiosks that at some point had instances of ISI's software loaded onto them so that the AUK's engineers could see how ISI's software worked. (ECF No. 266 at 17–18; ECF No. 271-3 at 15.) Senior executives at Amelco stated that the intent of these meetings was to see how ISI's kiosks

worked in order to learn how to operate retail sports-gambling kiosks in the United States. (ECF No. 271 at 17–18.) No evidence on the record, apart from argument of counsel, shows that ISI undertook measures to protect the confidentiality of its kiosks with other third parties who purchased kiosks. (*See* ECF No. 271 at 22; ECF No. 301 at 69.) Additionally, ISI's interrogatory responses state there are no confidentiality agreements between ISI and the various third parties to which it sells kiosks. (*See* ECF No. 266 at 57–58 (citing ECF No. 266-3 at 146–48).)

ISI provided Amelco advice and troubleshooting for their collaborative kiosks at the Wildwood Casino in Colorado. (ECF No. 266 at 27.) In summer 2020, ISI installed and operated kiosks using AUK's platform. (*See* ECF No. 266-2 at 91.) ISI's employee Angelique Ek provided instruction and troubleshooting on the kiosks to AUK for several months, including instruction on how to generate various compliance reports on the kiosks. (*See* ECF No. 271-2 at 98–100.)

ISI also provided Amelco its own code for connecting ISI's kiosks with the JCM printer. ISI's software developer Jim Gladney wrote at least one-thousand lines of code to enable JCM's software to work with kiosks obtained by ISI and used at the Wildwood casino. (ECF No. 271-2 at 116–17; *see also* ECF No. 265-2 at 37–39.)

ISI also provided Amelco several manuals and instruction on how to comply with regulations and operate a retail gambling kiosk successfully. (*See, e.g.*, ECF No. 271-3 at 12, 13.)

**D. Amelco Starts Selling Kiosks to Large Gaming Companies.**

Between 2021 and 2024, AUK entered lucrative contracts with gambling companies Hard Rock, Fanatics, WynnBET, Wind River, and Saracen to provide retail kiosks at their casinos. (ECF No. 272-3 at 214.) ISI has provided evidence of former AUK executives and employees stating that the Amelco parties used information and assistance from ISI to develop AUK's kiosks. (*See* ECF Nos. 245-

13 at 5; 272-3 at 10.) Facts on the record suggest that AUK's developers did not use a clean-room or otherwise segregate confidential information while developing its kiosks. (ECF No. 272-3 at 64.)

## II.   Procedural History

ISI sued AUK and AUSA in Nevada State Court in 2023, and the Amelco parties removed the action to this Court. (ECF No. 1.)

The operative complaint is ISI's Second Amended Complaint (ECF No. 70), which alleges breach of the NDA and MCA (claims 1 and 2), fraudulent inducement (claim 3), breach of the kiosk agreement or its implied covenant of good faith and fair dealing (claims 4 and 6), promissory estoppel and detrimental reliance regarding the kiosk agreement (claim 5), misappropriation of trade secrets under the federal Defend Trade Secrets Act (DTSA) and Nevada Uniform Trade Secrets Act (NUTSA) (claims 7 and 8), unjust enrichment (claim 9), quantum meruit (claim 10), fraud (claim 11), and negligent misrepresentation (claim 12).

## III.   Standard of Review

A party moving for summary judgment must show that there is no genuine issue as to any material fact in the claims for which it seeks summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 768 (9th Cir. 2024). For cross-motions for summary judgment, the Court considers each party's evidence without considering which motion provided the evidence. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

Amendments to Federal Rule of Civil Procedure 56 in 2010 clarify that the

substance of evidence offered in response to a motion for summary judgment must be admissible at trial, but such evidence does not need to "be admissible in its present form." *See Tamares Las Vegas Properties, LLC v. Travelers Indem. Co.*, 409 F. Supp. 3d 924, 945 (D. Nev. 2019) (cleaned up).

## IV.  Analysis

The Amelco parties seek summary judgment on all claims, arguing that none of the contracts protecting ISI's confidential information were valid, that ISI's common-law equitable-contract and tort claims do not apply or are preempted by ISI's trade-secret claims, and that ISI waived its trade-secret protections, failed to adequately identify its trade secrets, and otherwise failed to show misappropriation of trade secrets.

ISI seeks summary judgment on elements of its contract claims, namely that each contract bound AUSA and AUK, and also seeks summary judgment on the Amelco parties' affirmative defenses.

The Court first considers the four contracts at issue in this case, then ISI's equitable-contract (promissory estoppel, unjust enrichment, and quantum meruit) and tort claims, then ISI's trade secret claims. The Court then considers Amelco's affirmative defenses, ISI's motion to file a sur-reply, and both parties' motions to seal. The Court implicitly rejects any argument not addressed that is inconsistent with the outcome of this order. *See, e.g., PlayUp, Inc. v. Mintas*, 635 F. Supp. 3d 1087, 1099 (D. Nev. 2022).

### A. ISI's Contract Claims

Amelco seeks summary judgment on all of ISI's contract claims, taking the position that the only binding contract between the Amelco parties and ISI is the License Agreement. (*See* ECF No. 281 at 7, 33, 36.) ISI seeks summary judgment that the NDA binds AUSA—and AUK as its alter ego—from March 2019 onward and that the MCA binds AUSA and AUK from disclosing ISI's confidential materials. (*See* ECF No. 263 at 13.)

"It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written." *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 20 (Nev. 2001). "[C]onstruction of a contractual term is a question of law." *Sheehan & Sheehan v. Nelson Malley & Co.*, 117 P.3d 219, 223 (Nev. 2005); *The Power Co. v. Henry*, 321 P.3d 858, 863 (Nev. 2014) ("when a contract's language is unambiguous," a court "will construe . . . it according to that language"). "Whether a contract is ambiguous likewise presents a question of law." *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013) (internal citation removed). A contract is ambiguous if its terms may reasonably be interpreted in more than one way. *Id.* (internal citations removed).

### 1. The NDA

The Amelco parties argue that the March 2019 NDA dissolved when ISI and AUSA entered the License Agreement six weeks later. ISI disagrees and argues that the March 2019 NDA unambiguously binds AUSA.

ISI and AUSA dispute whether the NDA expired on its own terms. *See Galardi*, 301 P.3d at 366 (holding that a contract is "ambiguous if its terms may reasonably be interpreted in more than one way"). The language of the NDA suggests that it was meant to be replaced by a successive contract. At several points, it discusses a "Possible Transaction," "Possible Transactions," and "Definitive Agreement," all of which allow for a reasonable inference that it was a temporary contract meant to last only until the next, more complete agreement. (*See, e.g.,* ECF No. 262-1 at 3 (confidential information may be used "only in connection with the discussions . . . regarding the Possible Transactions").)

The NDA also contains a termination clause that suggests it only expires if the "Possible Transaction" does not take place. (*See* ECF No. 262-1 at 4 (NDA will "expire and terminate two (2) years from the date either Party notifies the other in writing that discussions concerning the Possible Transaction are terminated, whichever occurs first").) It has no term explaining expiration if the possible

9

transaction in fact takes place. *See Galardi*, 301 P.3d at 366 (ambiguity may arise through "indefiniteness in expression"). Viewed in the light most favorable to ISI, terminating the contract during or after the possible transaction may have required some kind of express repudiation. Additionally, the NDA's use of the plural "Possible Transactions" allows for a reasonable inference that the parties intended the NDA to persist beyond the next transaction.

Amelco argues that the generic merger clause in the License Agreement leaves no genuine issue of fact regarding expiration of the NDA. A successive contract or "novation" extinguishes an obligation from a previous contract when the existing contract and the new contract are valid, and the parties mean for the new contract to extinguish the old contract. *United Fire Ins. Co. v. McClelland*, 780 P.2d 193, 195 (Nev. 1989). Whether a novation occurred is a question of law only when the manifest intent of the parties is unequivocal. *Id.* at 195–96; *see also Granite Constr. Co. v. Remote Energy Sols., LLC*, 403 P.3d. 683, at *2 (Nev. 2017) (unpublished disposition).

Disputed issues of fact prevent the Court from entering summary judgment for AUSA or ISI on the novation. *See McClelland*, 780 P.2d at 195 (novation a question of fact when "evidence is such that reasonable persons can draw more than one conclusion"). The License Agreement's integration clause states that it is the "entire understanding and agreement" of the signatories: AUSA, ISI, and AUK. (ECF No. 262-2 at 8.) Without an express novation of the NDA between AUSA and ISI, it is ambiguous whether the parties intended to extinguish the NDA. *See Galardi*, 301 P.3d at 366. Facts on the record suggest that it was not ISI's intent: ISI's president Bill Stearns wrote in an email shortly after entering the License Agreement that "ISI has an NDA signed with Amelco," a fact which allows for the inference that at the time of entering the License Agreement, ISI did not believe that the License Agreement had extinguished the NDA. (ECF No. 272-4 at 46.)

Accordingly, the Court denies both motions for summary judgment regarding the novation of the NDA.

### 2. Alter Ego

Both parties seek summary judgment on the question of whether AUK may be bound under the NDA as AUSA's alter ego.

While this case is properly before the Court on both diversity and federal question grounds, the alter ego doctrine applies only to ISI's state law breach-of-contract claim, so the Court applies Nevada choice-of-law rules. *See California Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1089 (9th Cir. 2022) (applying state, not federal, choice-of-law rules when state law supplies substantive rule of decision). Under Nevada law, whether the members of an LLC can be held liable for the LLC's actions is decided under the law of that LLC's state of incorporation. *See Volvo Const. Equip. Rents, Inc. v. NRL Rentals, LLC*, 614 Fed. Appx. 876, 879–80 (9th Cir. 2015) (district court improperly applied Nevada law in alter ego analysis of Texas-incorporated LLCs). AUSA is incorporated in Delaware, so Delaware law applies for the alter ego analysis. (ECF No. 263-6 at 5.)

Under Delaware law, summary judgment is inappropriate on an alter ego claim of liability if the plaintiff presents evidence allowing a factfinder to infer that separate corporate forms were meant to "eradicate the corporate structure of [the defendant] and its subsidiaries." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012). "Mere dominion and control of a parent over a subsidiary" does not alone allow for a claim of alter ego, and instead, the claimant must put forward evidence from which a factfinder could infer that the Defendant and its alleged alter ego "are involved in an elaborate shell game or are otherwise abusing the corporate form to effect a fraud." *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996). Delaware courts consider "(1) whether the company was adequately capitalized for the

undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) (internal citations omitted).

Disputed facts on the record prevent the Court from deciding the alter ego question at summary judgment. ISI has provided evidence that AUSA was in fact a façade for AUK. An email from AUSA's outgoing President, Rob Bone, explained that Damian Walton, AUK's co-owner, would continue as one of two main principals at AUSA; AUK's CEO would "continue to assist with all US business initiatives;" AUK's project manager would "continue to lead all development and product management efforts;" and AUK's Project Specialist would "continue to facilitate all customer support and JIRA deliverables." (ECF No. 263-10 at 2.) A reasonable factfinder could infer from this email that AUSA was a front for AUK. ISI has pointed to other facts on the record suggesting that AUSA maintains a low cash flow and lists Robert Miller's other company's headquarters as its official headquarters, while in fact AUK employees in the UK run AUSA's day-to-day business. (*See* ECF No. 262-6.) Answers from Robert Miller's deposition allow a reasonable factfinder to infer that Damian Walton, AUK's co-owner, is ultimately responsible for decisions made by AUSA. (*See id.*)[1] Sufficient evidence exists for a reasonable factfinder to infer that AUK formed AUSA as a front, which, when viewed in the light most favorable to ISI, enabled it to engage in underhanded business tactics.

On the other hand, viewed in the light most favorable to the Amelco parties,

---

[1] While not a basis for its decision, the Court notes that the Amelco parties simultaneously argue that Rob Bone lacked actual authority—as president of AUSA—to sign contracts on behalf of the company, (ECF No. 273 at 32), and that the alleged principal of AUSA, Rob Miller, explained his title at AUSA as, "I believe I'm the president." (ECF No. 262-6 at 5.)

facts on the record suggest that AUSA is merely a distributor for AUK's products in the United States (*see, e.g.*, ECF No. 266-2 at 109), that AUSA has maintained solvency and paid its debts throughout its existence, that AUSA has undertaken its own business deals separate from AUK, and that Miller and Walton collaboratively ran the company. (*See* ECF No. 266 at 76.) Accordingly, enough disputed facts exist to preclude summary judgment for either party on the alter ego question. The Court denies both motions.

### 3. The MCA

The Amelco parties seek summary judgment on ISI's claims for express breach of the MCA on behalf of AUSA by arguing that AUSA's representative lacked apparent authority to sign the 2019 MCA. ISI seeks summary judgment as to whether the MCA created confidentiality obligations between ISI, AUSA and AUK. The Amelco parties respond that the MCA only created obligations between a third party—JCM—and the Amelco companies and JCM and ISI.

### a. Apparent Authority

The Amelco parties argue that AUSA's President Rob Bone lacked apparent or actual authority to sign the MCA. (ECF No. 273 at 32.) "Apparent authority is that authority which a principal holds [its] agent out as possessing or permits [the agent] . . . to represent [the agent] as possessing, under such circumstances as to estop the principal from denying its existence." *Simmons Self-Storage v. Rib Roof, Inc.*, 331 P.3d 850, 857 (Nev. 2014), *as modified on denial of reh'g* (Nov. 24, 2014). "A party claiming apparent authority of an agent as a basis for contract formation must prove (1) that he subjectively believed that the agent had authority to act for the principal and (2) that his subjective belief in the agent's authority was objectively reasonable." *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 261 (Nev. 1997); *see also Bradley v. Nevada-California-Oregon Ry.*, 178 P. 906, 907 (Nev. 1919) (courts may presume agent "clothed with a title implying general powers, as vice president . . . is what the corporation holds him

1  out as being").

2      Undisputed facts on the record show that Rob Bone held himself out as

3  President of AUSA in communications with AUSA's principal Rob Miller. (*See* ECF

4  No. 279-3 at 2.) Rob Bone signed the MCA as president of AUSA. (ECF No. 262-

5  3 at 8.) Accordingly, AUSA's principal, Miller, effectively held Bone out as

6  president of AUSA, and ISI reasonably believed that Bone had authority to enter

7  contracts. Because the Court rejects the Amelco parties' argument regarding

8  apparent authority, there is no need to address the parties' arguments regarding

9  Bone's actual authority.

10      **b. Confidentiality Obligations**

11      The MCA unambiguously creates confidentiality obligations between ISI

12  and the Amelco companies. *See Kaldi*, 21 P.3d at 20 ("contracts will be construed

13  from the written language"); *The Power Co.*, 321 P.3d at 863 ("when a contract's

14  language is unambiguous," a court "will construe . . . it according to that

15  language"); *see also MMAWC, LLC v. Zion Wood Obi Wan Trust*, 448 P.3d 568, 572

16  (Nev. 2019) (parties' intent discerned from four corners of the contract). The MCA

17  defines the parties as JCM, ISI, AUSA, and AUK. (ECF No. 262-3 at 3.) The MCA

18  defines "Disclosing Party" as "the Party disclosing its Confidential Information

19  under this Agreement" and "Receiving Party" as "the Party receiving the

20  Disclosing Party's Confidential Information." (*Id.*) The MCA then creates a

21  confidentiality obligation between Disclosing Parties and Receiving Parties. (*Id.*;

22  *id.* at 5.)

23      The Amelco parties argue that one paragraph stating that JCM should

24  mark confidential material creates an issue of fact about whether the contract

25  created a relationship only between JCM and ISI and JCM and the Amelco

26  parties, respectively. (ECF No. 266 at 70.) While it is true that every word in a

27  contract "must be given effect if at all possible," this paragraph is plainly read as

28  encouraging JCM—a party new to the project—to mark its confidential materials,

not as limiting the Amelco parties' obligations to ISI. *See Musser v. Bank of Am.*, 964 P.2d 51, 54 (Nev. 1998) (internal citations omitted). This paragraph does not make the contract ambiguous, nor does it override the clear language defining the confidentiality relationship between disclosing and receiving parties. *See Galardi*, 301 P.3d at 366.

Accordingly, the Court denies the Amelco parties' motion for summary judgment on the MCA and grants ISI's motion for summary judgment on the issue of whether the MCA created a confidentiality obligation between ISI and the Amelco companies.

### 4. The Kiosk Agreement

The Amelco parties argue that ISI and the Amelco parties never executed a Kiosk Agreement, nor did they ever reach consensus on the material terms and conditions of such an agreement. (ECF No. 266 at 22–23, 37.) ISI responds that because ISI and the Amelco parties completed transactions on terms similar to those in draft agreements, a factfinder could reasonably find a contract to exist. (ECF No. 271 at 66.)

In Nevada, a valid contract requires "offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005). "[P]reliminary negotiations do not constitute a binding contract unless the parties have agreed to all material terms." *Id.* Nevada law recognizes that parties seeking a written contract usually reach preliminary agreement on some terms before finalizing the written contract. *Dolge v. Masek*, 268 P.2d 919, 921 (Nev. 1954). If the written contract never materializes, a party seeking to show that the preliminary agreement was itself an immediately binding agreement must do so with evidence that is "convincing and subject to no other reasonable interpretation." *Tropicana Hotel Corp. v. Speer*, 692 P.2d 499, 502 (Nev. 1985) (citing *Dolge*, 268 P.2d at 921); *see also Loma Linda Univ. v. Eckenweiler*, 469 P.2d 54, 56 (Nev. 1970); *see also Decesare v. Tirrell*, 445 P.3d 219 at *1 (Nev.

2019) (unpublished disposition).

ISI has not shown a possibility of meeting the evidentiary threshold required by *Dolge* and its progeny. First, both ISI and the Amelco parties anticipated a written contract governing provision of kiosks, as shown by ISI sending AUSA a draft Kiosk Agreement with extensive terms and conditions. (*See* ECF No. 266 at 21–22.) AUSA and, later, AUK did not agree to this draft and counteroffered with their own drafts with substantially different terms, which ISI also rejected. (*See* ECF No. 265-1 at 199, 200–01; ECF No. 266-2 at 120–25.) This back-and-forth continued over the next year and a half until—in ISI's president's own words—AUK's Chief Operating Officer "killed the deal" by stopping negotiations. (ECF No. 266-1 at 4–5; ECF No. 266-2 at 50; ECF No. 266-3 at 114, 116, 127.)

ISI argues that because it provided kiosks to AUK at the price term used in drafts of the Kiosk Agreement, whether the Kiosk Agreement existed is a question of fact. (ECF No. 271 at 66.) Even if ISI had begun performing according to its view of the Kiosk Agreement, that fact does not create a genuine issue regarding AUK accepting the Kiosk Agreement. *See Tropicana Hotel*, 692 P.2d at 502 (internal citations omitted) (denying argument that performance constituted acceptance "where the evidence clearly shows that the party performing did not consider the agreement to be binding"). Even viewed in the most favorable light to ISI, neither it nor Amelco considered the Kiosk Agreement final or binding. *See Loma Linda Univ.*, 469 P.2d at 56 (entering judgment as matter of law against breach claimant where parties contemplated written agreement but never reached acceptance).

Accordingly, the Court need not consider the remaining arguments regarding statute of frauds. The Court grants the Amelco parties summary judgment on ISI's claims for breach of the Kiosk Agreement and breach of its implicit covenant of good faith and fair dealing.

**B. Equitable Contract Claims**

Amelco seeks summary judgment on ISI's claims for promissory estoppel, unjust enrichment, and quantum meruit. Amelco argues that ISI has not met the elements for any of these claims.

**1. Promissory Estoppel**

Amelco argues that ISI cannot succeed on its promissory estoppel claim in place of its claims under the Kiosk Agreement because there was never a completed promise. In Nevada, promissory estoppel applies to "[a] promise which the promisor should reasonably expect to induce action or forbearance . . . does induce such action" and injustice can only be avoided by enforcing that promise. *Dynalectric Co. of Nevada v. Clark & Sullivan Constructors, Inc.*, 255 P.3d 286, 288 (Nev. 2011) (quoting Restatement (Second) of Contracts § 90(1) (1981)). The doctrine "is intended as a substitute for consideration, and not as a substitute for an agreement between the parties." *Vancheri v. GNLV Corp.*, 777 P.2d 366, 369 (Nev. 1989). "The promise giving rise to a cause of action for promissory estoppel must be clear and definite . . . [and] made in a contractual sense." *Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203, 1209 (Nev. 2015) (internal citation omitted). Because the Court has held that there was no promise between the parties regarding the Kiosk Agreement, promissory estoppel does not apply.

Accordingly, the Court grants the Amelco Parties' motion for summary judgment on ISI's promissory estoppel claim based on the Kiosk Agreement.

**2. Unjust Enrichment and Quantum Meruit**

The Amelco parties argue for summary judgment on ISI's unjust enrichment and quantum meruit claims because ISI has failed to show evidence of damages.

Unjust enrichment requires a plaintiff to show that it conferred a benefit on the defendant, that the defendant appreciated that benefit, and that the defendant accepted and retained the benefit under such circumstances that it

would be inequitable for the defendant to retain that benefit without paying. *Nautilus Ins. Co. v. Access Med., LLC*, 482 P.3d 683, 688 (Nev. 2021) (citing *Cert. Fire Prot. Inc. v. Precision Constr.,* 283 P.3d 250, 257 (Nev. 2012)). "In a case with a quantum meruit or unjust enrichment theory of recovery, the proper measure of damages is the reasonable value of the services." *Asphalt Prods. Corp. v. All Star Ready Mix, Inc.*, 898 P.2d 699, 701 (Nev. 1995) (citing *Flamingo Realty v. Midwest Development,* 879 P.2d 69, 71 (Nev. 1994)) (internal formatting removed).

The Amelco parties argue that ISI's allegation that it spent "thousands of man-hours" on the Kiosk Co-Development Project lacks support in the record. (ECF No. 266 at 48.) ISI points to enough facts on the record for a reasonable factfinder to assess at least some damages based on unjust enrichment. ISI's President testified to having meetings and phone calls discussing a "flat rate fee" or "reward basis" for ISI's services in procuring and administering retail gambling kiosks, at $1,000 per kiosk and $100 per month per kiosk for an undetermined period. (*See* ECF No. 271-3 at 44.) Additionally, enough facts in the record exist from which a factfinder could infer that ISI suffered damages from Amelco stringing it along. (*See, e.g.,* ECF No. 271-3 at 6 (ISI providing Amelco with knowledge of companies that perform key tasks in kiosk gambling operations); *see also* ECF 272-3 at 123 (estimating profits made from AUK's retail sports-gambling contracts in the United States)).

The Amelco parties next argue that Section 7 of the License Agreement, providing for "bespoke customization" of Amelco's product, precludes ISI's unjust enrichment and quantum meruit claims. (ECF No. 266 at 47.) ISI argues that the language of Section 7 of the License Agreement refers to Amelco's obligations to ISI for a specific customization task unrelated to developing retail kiosks.

Courts may not "interpolate in a contract what the contract does not contain." *State Dep't of Transportation v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 402 P.3d 677, 682 (Nev. 2017). Sections 7(a) and 7(b) of the License

Agreement allow ISI to pay Amelco for customizing Amelco's system. (ECF No. 262-2 at 4–6.) Section 7(c) of the License Agreement, which refers to Section 6(a) of the same agreement, allows Amelco to pay ISI for helping Amelco "modify its risk management screens to make the formatting consistent with that used in Nevada." (*Id.*) This is a much narrower subject matter than the broader kiosk Americanization and development projects for which ISI is seeking relief. Amelco's argument regarding Section 7(c) of the License Agreement fails as a matter of contract interpretation.

Because the Court denies the Amelco parties' arguments regarding summary judgment on ISI's unjust enrichment and quantum meruit claims for absence of damages, it will not address ISI's argument regarding disgorgement and will allow the parties to argue for the appropriate remedy at a later stage in litigation.

### C. Tort Claims

Amelco argues that ISI has not shown evidence of a false or negligent misrepresentation, or a material omission, required for ISI's fraud, negligent misrepresentation, and fraudulent inducement claims. (ECF No. 266 at 53.)

In Nevada, fraud requires showing "(1) a false representation, (2) the defendant's knowledge or belief that the representation is false, (3) the defendant's intention to induce the plaintiff's reliance, (4) the plaintiff's justifiable reliance, and (5) damages." *Nevada State Educ. Ass'n v. Clark Cnty. Educ. Ass'n,* 482 P.3d 665, 675 (Nev. 2021). Negligent misrepresentation requires showing that a defendant has supplied "false information for the guidance of others in their business transactions," and failed "to exercise reasonable care or competence in obtaining or communicating the information" to the plaintiff, resulting in damages to the plaintiff. *See Halcrow, Inc. v. Eighth Jud. Dist. Ct.,* 302 P.3d 1148, 1153 (Nev. 2013), *as corrected* (Aug. 14, 2013) (internal citations omitted). Fraudulent concealment requires showing that a defendant concealed

a material fact that it had a duty to disclose with the intent to defraud the plaintiff and induce it to act differently; the plaintiff was unaware of this and would have acted differently but for the concealment; and the plaintiff was harmed as a result. *See Leigh-Pink v. Rio Properties, LLC*, 512 P.3d 322, 325–26 (Nev. 2022) (citation omitted).

ISI has provided sufficient evidence that the Amelco parties made material omissions regarding their intent to contract and continue working with ISI. *See Blanchard v. Blanchard*, 839 P.2d 1320, 1322 (Nev. 1992) (fraudulent representation may be misleading "because it partially suppresses or conceals information"). AUK's head of business development stated in his deposition that while he knew ISI wanted to finalize the Kiosk Agreement, that for Amelco "it was never gonna fly." (ECF No. 272-3 at 68, 69.) Evidence from former Amelco executives suggests that it relied on ISI's assistance and confidential information to develop its own rival kiosks. (*See* ECF Nos. 245-13 at 5.) Together, this is enough for a reasonable juror to find that the Amelco parties were stringing ISI along to develop a rival product.

Amelco next argues that ISI has failed to show justified reliance on any representations made by the Amelco parties. A party may show reliance based on inferences that if the omitted information were disclosed, the party would have "been aware of it and behaved differently." *See Beauregard v. Sampson*, No. 2:20-CV-02123-KJD-DJA, 2022 WL 17813072, at *3-4 (D. Nev. Sept. 28, 2022), *reconsideration denied*, No. 2:20-CV-02123-KJD-DJA, 2023 WL 4826519 (D. Nev. June 6, 2023) (cleaned up). ISI has provided enough record evidence showing that its executives reasonably expected a kiosk agreement to go forward that would allow a reasonable factfinder to infer that ISI would have stopped sharing information with Amelco if it had known that Amelco had no intent to move forward with an agreement. (*See e.g.*, ECF No. 272-5 at 16.)

Finally, the Amelco parties argue that ISI lacked any duty to disclose

1    anything to ISI. (ECF No. 266 at 55.) A duty of truthfulness attaches when parties

2    have begun negotiations, even if the negotiations ultimately fail. *See Beauregard*,

3    2022 WL 17813072, at *3.

4        Accordingly, the Court holds that sufficient evidence exists for ISI's fraud,

5    negligent misrepresentation, and fraudulent concealment claims to move

6    forward. The Court therefore denies Amelco's motion for summary judgment as

7    to these claims.

8        **D. Preemption of Common-Law Claims Under NUTSA**

9        The Amelco parties argue that all ISI's common law claims—unjust

10    enrichment, quantum meruit, fraudulent inducement, intentional

11    misrepresentation, and negligent misrepresentation—are preempted by the

12    Nevada Uniform Trade Secret Act (NUTSA). (ECF No. 266 at 46, 51.) ISI responds

13    that preclusion should only be applied after a factfinder has determined that the

14    relevant information qualifies as a trade secret.

15        "NRS 600A.090 precludes a plaintiff from bringing a tort or restitutionary

16    action based upon misappropriation of a trade secret beyond that provided by"

17    NUTSA. *Frantz v. Johnson*, 999 P.2d 351, 357 (Nev. 2000). Whether information

18    is a trade secret is a question of fact. *Id.* at 358. There is no need to apply

19    preclusion doctrine until there has been a resolution as to whether the items

20    provided to the Amelco parties qualify as trade secrets. *See Integrated Direct*

21    *Mktg., LLC v. May*, 129 F. Supp. 3d 336, 347 (E.D. Va. 2015), *aff'd*, 690 F. App'x

22    822 (4th Cir. 2017); *see also Frantz*, 999 P.2d at 357–58 (holding that the "district

23    court erred in awarding damages" based on common-law claims). Accordingly,

24    the Court denies this argument at this time but permits the Amelco parties to

25    renew it should a factfinder find that ISI has proven that its alleged confidential

26    information qualifies as trade secrets.

27        **E. Trade Secret and Confidential Information Claims**

28        The Amelco parties argue that ISI has failed to maintain the confidentiality

21

of its alleged trade secrets and contractually confidential information, that ISI has not sufficiently identified its trade secrets and confidential information, and that ISI has failed to show any misappropriation.

### 1. Waiver of Confidentiality

Amelco argues that ISI waived confidentiality of its trade secrets and confidential information through its filings in this court. (ECF No. 266 at 56 (citing ECF No. 155).) The party asserting claims involving trade secrets must take reasonable efforts to maintain secrecy. *See* NRS 600A.030(5)(b); 18 U.S.C. § 1839(3)(A) (same); *see also* ECF No. 262-3 at 4–5 (excluding from protection information which later becomes public through no fault of the other party). Public filing of trade secrets may be a basis for deeming trade-secret claims waived. *See Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006).

Though the Amelco parties contend that ISI's interrogatory responses and revised log of trade secrets waived confidentiality, these do not contain the actual trade secrets ISI alleges that the Amelco parties misused. The trade-secret log contains descriptions like, "ISI's entire playbook," "custom-written code," "details for retail teller reports," "kiosk admin panel," "knowledge and show-how regarding the event log," "assistance in creating Meter reports and details of those reports." (ECF No. 129-4 at 2.) The discovery responses include lists like "ISI's supplier and vendor lists," "ISI's proprietary on-kiosk software, including the architecture, features, and capabilities of that software," "ISI's back-office reporting module software, which included approximately 20 component reports and the detailed roadmap to enable use," "ISI's proprietary and confidential methods and systems for achieving regulatory compliance and approval for use in U.S. jurisdictions." (ECF No. 129-2 at 11; ECF No. 129-3 at 11.) These descriptions did not waive confidentiality.

### 2. Insufficient Identification of Trade Secrets

The Amelco parties next argue that the items identified by ISI were not

trade secrets or confidential. (ECF No. 266 at 57.)

Under the Defend Trade Secrets Act (DTSA) and NUTSA, "the definition of what may be considered a 'trade secret' is broad," and trade secrets broadly consist of "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020).

### a. ISI's Playbook

The Amelco parties argue that ISI's compilation trade secret, its "playbook," is not confidential because ISI claimed to have particularly identified it in its interrogatory responses and log. (ECF No. 266 at 57.) ISI's President, however, described the playbook as a compilation of feedback, the "MICS" or "MIX" manual describing internal controls for retail sports betting systems, including software, hardware, GLI, casino standards, and state gaming authority regulations, an operations manual with standard operating procedure, and other informally provided advice. (ECF No. 271-3 at 12, 13.) There is enough of a question of fact to permit a factfinder to assess whether the playbook was a trade secret.

### b. ISI's Kiosks and Instances of Software

The Amelco parties next argue that ISI has not provided evidence that instances of ISI's back-end software were protected by confidentiality provisions, pointing to ISI's interrogatory responses, in which it stated that there are no confidentiality agreements between the various third parties it sold kiosks too. (*See* ECF No. 266-3 at 146–48.) ISI responds by stating that reporting features and functionality of its software were "non-public, protected by access credentials, [and] shared under NDA." (ECF No. 271 at 22; ECF No. 301 at 69.) ISI's cited exhibit, ISI President Bill Stearns's deposition testimony, does not state that ISI's other kiosk customers used the back-end system under a confidentiality obligation. (*See* ECF No. 271 at 22.) Accordingly, without facts on the record showing that instances of back-end software would have been confidential, ISI

1    has not met its burden to show these instances of software were trade secrets or

2    confidential.

### c. ISI's Code for the JCM Printer

4    Amelco next argues that ISI's custom code that enabled JCM printers to

5    work with its kiosks—items 4, 5, 6, and 14 on its trade-secret log—is not a

6    protectable trade secret because such code was available from JCM. *See Barton*

7    *Assocs. Inc. v. Trainor*, 507 F. Supp. 3d 1163, 1166-67 (D. Ariz. 2020)

8    (information about a third party not confidential if obtainable from the third

9    party); (ECF No. 266 at 58, 66–67). ISI cites to deposition testimony from ISI

10   software developer Jim Gladney stating that around two-thousand lines of

11   relevant code in these programs were not developed by JCM and were in fact

12   "completely written" by Gladney and provided to no one outside of ISI except

13   Amelco. (ECF No. 271-2 at 116–17; *see also* ECF No. 265-2 at 37–39.) This

14   suffices to reject Amelco's argument.

15   Amelco also argues that this code was not confidential because it was

16   provided to Amelco before ISI, Amelco, and JCM entered the MCA, and because

17   it was made using JCM's proprietary coding language. (ECF No. 266 at 66.) ISI's

18   expectation of confidentiality regarding this code is an issue of fact, and sufficient

19   facts on the record—such as the NDA and the contemporaneous email in which

20   ISI's president Bill Stearns expressed belief that the parties had a confidentiality

21   relationship—preclude summary judgment on this point. (*See* ECF No. 272-4 at

22   46.)

23   Amelco next argues that ISI has not shown that Defendants used this

24   specific code in their kiosks. Sufficient facts on the record—namely that Amelco

25   launched kiosks with similar capabilities after obtaining this information—would

26   allow for a juror to infer that this secret, and others, were used to develop the

27   Amelco parties' kiosks. (*See* ECF Nos. 245-13 at 5; 272-3 at 10.) Accordingly,

28   facts on the record would allow a reasonable juror to find that these items were

confidential.

### d. ISI's Items Related to Partis and Wildwood

Amelco next argues that items 7-10 and 17-56 on ISI's trade-secret log were accessible to third parties Wildwood Casino and Partis Solutions, and thus not confidential or protectable trade secrets. *See Barton Assocs. Inc.*, 507 F. Supp. 3d at 1166-67. ISI provides a contract between ISI and Wildwood Casino which includes a term of confidentiality that the parties would "honor and maintain the confidentiality of such confidential or proprietary information as may be disclosed by one party to the other, including . . . other business information related to the performance of their respective responsibilities." (ECF No. 272-2 at 107.) ISI provides a marketing agreement with Partis signed in 2020 which includes a provision explaining that the parties intend to "retain in confidence at all times" all confidential information "disclosed by the other [p]arty." (ECF No. 272-2 at 79–80.) Accordingly, facts on the record would allow a reasonable juror to find that these items were confidential.

### e. Information Related to Regulatory Requirements

Amelco next argues that Items 7-10, 17-18, 20-29, 31-32, 36, 43-53, and 56 include information required to be kept on kiosks under Colorado's gaming authority and are therefore not confidential. (ECF No. 266 at 58.) Amelco also argues that Item 11, which is an "internal controls" document, has a format and contents mandated by Colorado's gaming authority. (*Id.*) ISI responds by stating that these trade secrets are not the Colorado regulations themselves but the documents and assistance provided by ISI to show Amelco how to comply with these regulations. (ECF No. 271 at 57.) To support its contention, Amelco cites to ISI employee Angelique Ek's deposition testimony in which she stated that certain line items in reports that ISI knew how to generate are required by the Colorado Division of Gaming. (ECF No. 265-2 at 8–9.) This evidence does not obviate ISI's previous showing that ISI's know-how and reports on how to comply with such

requirements were kept confidential. (*See* ECF No. 272-3 at 207–08 (compiling ISI evidence regarding technical issues with kiosks and assistance in understanding compliance regulations); *see also* ECF No. 272-2 at 116–39.)

### f. Vendor Lists

Amelco next argues that ISI waived confidentiality of Items 15 and 16, disclosure of vendors, by publicly disclosing such vendors in its publicly filed interrogatory responses. (ECF No. 266 at 58.) It further argues that the vendors mentioned are well-known within the industry, and some are publicly identified on ISI's website. (*Id.*) ISI has not responded to this argument, and the Court accordingly finds that the Amelco parties have shown an absence of genuine fact on the confidentiality of Items 15 and 16 in the trade-secret log. The Court accordingly does not address Amelco's arguments about identification of proprietary vendor lists. (ECF No. 266 at 69.)

### g. Undisclosed, Unidentified, and Waived Items

Amelco next argues that Item 57 was publicly available on ISI's website and that Items 57-60 were not adequately designated as confidential during discovery. (ECF No. 266 at 59.) ISI does not respond to the first argument and responds to the second that the terms of the protective order allow for retroactive designation of this evidence as confidential. (ECF No. 271 at 58.) The Court finds ISI's response to the first argument regarding Item 57 waived and agrees with ISI regarding the second argument. Accordingly, ISI waived confidentiality of the Item 57 and has not waived confidentiality for Items 58-60 by inadvertently not labeling them as confidential in discovery.

Amelco next argues that Items 12 and 13 of ISI's trade-secret log were never provided to Amelco and are also in the public domain. (ECF No. 266 at 67–68.) ISI does not respond to these arguments, and the Court accordingly accepts Amelco's arguments for granting summary judgment on these items of the trade-secret log.

### h. JIRA Logs

Amelco next argues that ISI's project-management log (referred to as a "JIRA log" for the name of the tool), in which ISI employee Angie Ek troubleshooted issues for Amelco regarding the ISI-Amelco kiosk in Colorado does not qualify as a trade secret. (ECF No. 266 at 67.) The JIRA logs detailing Ek's assistance in operating a retail sports-betting kiosk with Amelco suffice to show that Ek provided "know how" and "show how" to qualify as a trade secret. (*See e.g.*, ECF No. 271-2 at 104.) Amelco also argues that because Ek was troubleshooting issues in Colorado, and Amelco does not currently operate in Colorado, that ISI cannot prove that Amelco misappropriated any trade secret. (ECF No. 266 at 69.) A reasonable juror could infer that the sorts of troubleshooting and compliance provided by Ek would apply in other jurisdictions. (*See* ECF No. 271 at 57–58.) Amelco makes further arguments regarding specific instances of JIRA logs that Amelco may have not used because Ek only identified problems without providing solutions. (ECF No. 266 at 69.) Parsing of these specific objections is better accomplished at the motions-in-limine stage of proceedings, and the Court defers its decisions on which JIRA logs may go before the jury until then. Accordingly, the question of whether Ek's assistance qualifies as a trade secret may proceed.

### 3. Misappropriation of Trade Secrets

Amelco argues that insufficient facts on the record exist to allow a reasonable factfinder to find that the Amelco parties actually used ISI's alleged trade secrets or confidential information. (*See* ECF No. 281 at 23–24.) ISI's expert reports and testimony from Amelco's former employees regarding Amelco's intent to use ISI as a model for developing retail kiosks allow for a reasonable factfinder to infer that Amelco used at least some of this information—whether expressly or as negative knowledge—to develop the retail sports-gambling kiosks it eventually sold to casinos. (ECF No. 271 at 35–36.) The Court denies Amelco's argument.

### F. ISI's Motion to Dismiss Amelco's Affirmative Defenses

ISI seeks to dismiss many of Amelco's affirmative defenses. (*See* ECF No. 263 at 40–76.) Amelco responds regarding several, but not all, of these affirmative defenses. (*See* ECF No. 273 at 34.) As discussed at the hearing, the Court agrees with Amelco's request that disposition of many of the affirmative defenses should be deferred until discovery has entirely closed. (*See* ECF No. 301 at 47.) Accordingly, the Court grants ISI's motion with respect to the six defenses that Amelco did not respond to: Defenses Numbers 5, 8, 13, 20, AUK 23, AUK 24/AUSA 23, and defers disposition of the remaining affirmative defenses to a later stage of litigation. (*See* ECF No. 279 at 23.)

## V.   Other Motions

### A.    Motion For Sur-reply (ECF Nos. 283, 284, 285)

The Court finds good cause to grant ISI's motion to file a sur-reply to Amelco's motion for summary judgment. *See* LR 1-4 (Court may waive any local rules if interests of justice require); LR 7-2. ISI's sur-reply clarifies that the 2010 Amendments to Federal Rule of Civil Procedure 56 do not require evidence to be admissible in its current form to create an issue of material fact on summary judgment. (ECF No. 283-1 at 4.) This point of law is well-taken, and accordingly, the Court grants ISI's motion to file a sur-reply.

### B.    Motions to Seal

ISI sought to seal eight exhibits, including the contracts at issue in this case and several deposition excerpts at issue in the motion for summary judgment. (ECF No. 262.) The Amelco parties sought to seal the NDA, Licensing Agreement, and MCA, among several other exhibits. (ECF No. 264.) The parties have since consented to unsealing several exhibits. (*See* ECF Nos. 267, 269.)

There is a strong presumption in favor of public access to judicial filings and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). A

party seeking to overcome this presumption for attachments to a dispositive pleading must show "compelling reasons supported by factual findings . . . that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Id.* at 1178-79 (quotations omitted). District courts have broad latitude to grant protective orders based on "trade secrets or . . . commercial information." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002). A litigant may meet the "compelling reasons" standard by showing that sealing is needed to prevent documents from being used "as sources of business information that might harm a litigant's competitive standing." *See In re Electronic Arts*, 298 F. App'x 568, 569 (9th Cir. 2008) (citing *Nixon*, 435 U.S. at 598). "The fact that a court has entered a blanket stipulated protective order and that a party has designated a document as confidential pursuant to that protective order does not, standing alone, establish sufficient grounds to seal a filed document." (ECF No. 67 at 2 (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1133 (9th Cir. 2003)).)

Regarding sealed exhibits attached to ISI's motion for summary judgment, the Amelco parties consented "to the unsealing of Exhibits 1, 7, 8, and 10–12 attached to ISI's motion." (ECF No. 267 at 2.) ISI also requested "that all exhibits to its summary-judgment motion be unsealed, with the exception of the dollar-figure contained at Section 6(g) of the License Agreement (on page 4) and Exhibits A through D (on pages 7-10)." (ECF No. 269 at 4.) The Amelco parties argue that these exhibits to the License Agreement contain "highly confidential descriptions and visual depiction of AUK's product, pricing information, and business operations." (ECF No. 270 at 4.) In the alternative, the Amelco parties request that the License Agreement and its attachments be redacted as follows: Exhibit 14, Clauses 1 – 6 of the License Agreement and Exhibit B; Exhibit 15, Clauses 1 – 7 of the License Agreement and each Exhibit; Exhibit 16, Clauses 1 – 8 of the

License Agreement and each Exhibit; Exhibit 17, Clauses 1 – 7 of the License Agreement and each Exhibit; Exhibit 18, Clauses 1 – 7 of the License Agreement, and each Exhibit; Exhibit 19, Clauses 1 – 7 of the License Agreement, and each Exhibit; Exhibit 20, Clauses 1 – 8 of the License Agreement, and each Exhibit.

The Amelco parties originally sought to seal Exhibits 2, 10 (the 2019 NDA), 13, 14, 16, 17, 18, 19, 20, 24, 25, 26, 27, 28, 32, 35, 36, 37, 38, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 85, 86, 94, 97, 99, 101, 102, 103, 104, 109, 110, and their motion for summary judgment where it quotes from those exhibits. (ECF No. 264 at 1–2.) Amelco then consented to unsealing Exhibits 14, 15, 16, 17, 18, 19, 20, and 34,  as well as Exhibits 2, 10, 13, 24, 25, 26, 32, 35, 36, 37, 38, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 85, 86, 94, 97, 99, 101, 102, 103, 104, 109, and 110 to Amelco's motion for summary judgment (ECF No. 266). (ECF No. 270 at 2.) From this briefing, it appears that Amelco seeks to seal only Exhibits 27 and 28 of its motion, but the Court notes that these have already been filed without seal. (*See* ECF No. 265-2 at 2–41.) Accordingly, the Court orders that all the exhibits mentioned in this paragraph be filed without seal, if not already on the record without seal.

The Court holds that the importance of the License Agreement to the disposition of the motions for summary judgment compared to the showing provided by the Amelco parties does not justify sealing the entire agreement. *See Kamakana*, 447 F.3d at 1178. The Court acknowledges Amelco's argument regarding pricing and strategy details in the License Agreement, and, accordingly, partially grants Amelco's request made in the alternative to refile a redacted License Agreement as detailed in its brief. (ECF No. 270 at 5.) Amelco may not redact any provision of the License Agreement which this Court quotes or otherwise cites in this order.

Similarly, the Court holds that no "compelling reasons supported by factual findings" have been presented that justify sealing the MCA. *See Kamakana*, 447

F.3d at 1178; (*see* ECF No. 269 at 8). The MCA is critical to resolving these dispositive motions and is therefore important to the public's interest in understanding the judicial process. *See infra* IV.A.3. The Court therefore orders that its seal (Exhibit 3 in ISI's Motion (ECF No. 263); Exhibit 31 in Amelco's Motion (ECF No. 266)) be removed or that it be filed without seal.

## VI.    Conclusion

Accordingly, the Court rules as follows regarding the cross-motions for summary judgment (ECF Nos. 262, 263, 265, 266):

The Court denies both parties' motions for summary judgment on whether the NDA binds AUSA, whether the NDA was novated by the License Agreement, and whether AUK is the alter ego of AUSA. (Claim 1.)

The Court grants ISI's motion for summary judgment on the question of whether the MCA created a duty of confidentiality between ISI, AUSA, and AUK. (Claim 2.)

The Court grants the Amelco parties' motion for summary judgment on ISI's breach of Kiosk Agreement, Covenant of Good Faith and Fair Dealing, and Promissory Estoppel claims. (Claims 4, 5, 6.)

The Court denies the Amelco parties' motion for summary judgment on ISI's Quantum Meruit, Unjust Enrichment, Fraudulent Inducement, Fraud, and Negligent Misrepresentation claims. (Claims 3, 9, 10, 11, 12.)

The Court grants and denies the Amelco parties' motion for summary judgment on ISI's Trade Secret claims as detailed in that section of the order. (Claims 7, 8.)

The Court grants ISI's motion with respect to the six defenses that Amelco did not respond to: Defenses Numbers 5, 8, 13, 20, AUK 23, AUK 24/AUSA 23, and defers disposition of the remaining affirmative defenses to a later stage of litigation. (*See* ECF No. 279 at 23.)

The Court grants ISI's motion for a sur-reply. (ECF No. 283.)

The Court grants in part and denies in part the parties' motions to seal as explained in Section V.B, in brief that the Clerk unseal Exhibits 2, 10, 13, 14–20, 24–28, 31, 32, 34–38, 40, 41, 42, 44, 45–51, 85, 86, 94, 97, 99–104, 109, and 110 of Amelco's motion for summary judgment (ECF No. 266) and Exhibits 1, 3, 7, 8, and 10–12 of ISI's motion for summary judgment (ECF No. 263). If the Clerk is unable to unseal these specific exhibits because of how the parties filed their motions, the Court instructs the Clerk to notify the Court and the parties via Minute Order so that the parties may re-file these motions with relevant exhibits unsealed.

The Court also orders that the Amelco parties file a redacted version of the License Agreement as discussed in Section V.B.

Dated this 13th day of June, 2025.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE